# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT BROWN,<br><br>              Petitioner,<br><br>   v.<br><br>JAMES A. YATES, Warden,<br><br>              Respondent. | 1:04-CV-5817 OWW DLB HC<br><br>FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS<br><br>[Doc. #1] |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

On November 16, 2000, Petitioner was convicted in the Tulare County Superior Court by jury trial of three counts of second degree robbery in violation of Cal. Penal Code § 211, one count of intimidation of a witness in violation of Cal. Penal Code § 137(b), one count of receiving stolen property in violation of Cal. Penal Code § 496(d), and one count of arson of another's property. See Exhibit 1, Respondent's Answer to Petition (hereinafter "Answer"). On May 14, 2001, Petitioner was sentenced to a total determinate term of 16 years in state prison. Id.

1    Petitioner filed a notice of appeal to the California Court of Appeals, Fifth Appellate District

2  (hereinafter "5th DCA"). See Exhibit 2, Answer. On December 30, 2002, the 5th DCA struck the

3  restitution order but affirmed the judgment in all other respects. See Exhibit 3, Answer.

4    On February 13, 2003, Petitioner filed a petition for review in the California Supreme Court.

5  See Exhibit 4, Answer. The petition was denied on March 19, 2003. Id.

6    On June 9, 2004, Petitioner filed the instant federal petition for writ of habeas corpus in this

7  Court.  The petition presents the following six (6) grounds for relief: 1) "Petitioner's trial attorney

8  rendered prejudicial ineffective assistance of counsel by failing to investigate and failing to consult

9  with Petitioner"; 2) "The state public defender rendered prejudicial ineffective assistance of counsel

10  while representing Petitioner on his motion for new trial by failing to obtain sworn declarations from

11  Keisha Jones and Robin Ellis"; 3) "The prosecutor prejudicially violated Petitioner's Fifth

12  Amendment privilege against self-incrimination and Fourteenth Amendment right to due process by

13  eliciting testimony concerning his post-arrest silence"; 4) "The trial court erred in instructing the jury

14  with CALJIC 2.15, denying Petitioner due process of law"; 5) "The trial court erred prejudicially

15  when it instructed the jury in accordance with CALJIC No. 17.41.1"; and 6) "The cumulative effect

16  of the errors at Petitioner's trial, discussed earlier, deprived Petitioner his constitutional right to due

17  process of law and a fair trial."

18    Respondent filed an answer to the petition on October 6, 2004. Respondent concedes the

19  petition is exhausted but meritless. Petitioner did not file a traverse.

20                          **FACTUAL BACKGROUND**

21    The Court hereby adopts the factual summary of the case as set forth by the 5th DCA in its

22  opinion of December 30, 2002:

23        At approximately 2:45 p.m. on April 7, 2000, appellant entered the Bank of the Sierra
       in Three Rivers, approached teller Eileen Rafter, placed an envelope on the counter, and
24     moved it toward her. The envelope bore the following message: "This is a robbery! Please
       cooperate and nobody will get hurt!" Rafter saw that appellant had a gun in his hand and she
25     became afraid. Rafter opened her drawer, took "about $523" in currency out, and "handed it
       to him or just put it on the counter." She simultaneously dropped the robbery note in a trash
26     can. Appellant took the money and placed it in a brown plastic bag. Fearing retaliation,
       Rafter did not give him "bait money" (currency bearing recorded serial numbers that sets off
27     a silent alarm system).

28        Appellant wanted more money and demanded that Rafter obtain additional currency

from other tellers. Rafter had a fellow teller, Debra Jones, walk to her window. Rafter showed Jones the note on the envelope in the trash can. Jones went back to her window, took the money out of her drawer, and gave it to appellant. In doing so, Jones took bait money out of her drawer, setting off the silent alarm. She too noticed appellant was holding a gun.

Appellant was still not satisfied. He told Rafter he wanted money from the drawer of a third teller, Phyllis Tury. However, Tury was in the women's lounge at the time. Rafter contacted Tury, informed her the bank was being robbed, and indicated the robber wanted money from Tury's drawer. Tury took bait money and other money out of the drawer and gave it to appellant. Tury handed the money to Rafter, who gave it to appellant. Rafter returned to Tury and said appellant wanted $50 bills. Tury removed the requested bills from her drawer and either gave them to Rafter or put them in the bag.

After putting all the money in a bag, appellant asked for a teller's driver's license. He explained this was a form of insurance because there were people watching. Appellant said if he got caught, his friends would come back and kill the licensee; [he] also said he would take hostages if necessary. Rafter went to her purse, took out her license, and gave it to appellant. Appellant then left the bank and drove away in a green Honda Accord.

Marilyn Pap was a customer at the Bank of the Sierra at the time of the robbery. She noticed a man enter the bank. A few minutes earlier she had seen the same man sitting inside a green Honda parked in the middle of the road near her home.[1] The man went to the teller window next to the one at which Pap was conducting her business. He stood at the window a long time and did not seem to be conducting any transactions. Pap also noticed the bank tellers seemed to be acting a little strange. Pap completed her transaction, left the bank, and saw the green car she had seen earlier. A short while later, she noticed the police arriving at the bank.

Tulare County Deputy Sheriff James Fansett was dispatched to the Bank of the Sierra at about 2:58 p.m. in response to the silent alarm. A short time later, he and another deputy left the bank to investigate the report of a vehicular crash on Pierce Drive. The description of the vehicle matched that of the robbery suspect's vehicle. When the deputies arrived at the location, they found the vehicle on fire. Fansett called the license number into dispatch and learned the vehicle had been reported stolen from a Visalia home in early February 2000. The fire department extinguished the fire. The parties stipulated the fire was willfully and maliciously set and was the product of arson. Fansett identified People's exhibit Nos. 22-24 as photographs of the vehicle.

Three Rivers resident Melissa Cunningham was on her way back from Visalia on the day of the robbery. She saw a dark Honda with a ding on the side stopped at a traffic sign on Pierce Drive. Cunningham said a Black man was seated inside the vehicle.

Tulare County Sheriff's Detective Ed Christopherson obtained two latent fingerprints from the envelope bearing the robbery note. Detective Christopherson also recovered fingerprints from outside the right rear passenger door window of the suspect's vehicle.[2] The parties stipulated that appellant's fingerprints were on record in a State of California automated system because of a prior traffic offense. The parties also stipulated that appellant's fingerprints were on both the envelope and the vehicle.

The parties further stipulated that on April 17, 2000, Detective Gary Chambers and

---

[1] Pap said the vehicle depicted in People's exhibit Nos. 22, 23, and 24 looked like the one she had seen that day.

[2] Christopherson was unable to retrieve usable fingerprints from the interior of the vehicle.

other law enforcement officers searched appellant's residence in Hanford. During that search they located (a) an envelope; (b) a bundle of $1 bills in a Bank of the Sierra wrapper; and (c) two receipts from FootAction in Hanford (People's exh No. 54). The wrapper was located in a drawer inside appellant's bedroom and the receipts were found in a pocket of a pair of jeans. Eileen Rafter identified her initials on the money recovered from appellant's residence. The People introduced into evidence a photograph of appellant at the time of his arrest.

Tulare County Sheriff's Sergeant John W. Gray testified a number of items were found in the suspect's Honda Accord. These included a pair of pants, a brown plastic grocery bag, a white, hooded sweatshirt, and a red baseball cap bearing the letter "P."

A few days after the incident, Detective Chambers showed several witnesses a six-picture photographic lineup. Appellant was the person depicted in photograph No. 2. Rafter told Chambers the person in position number two looked close to the suspect but she was not positive. Debra Jones could not identify anyone in the photographs. Phyllis Tury identified appellant's photograph. However, an individual named James Miller was unable to identify anyone. Marilyn Pap said she was not sure about the robber's identity but if she were to select a picture it would be photograph No. 2. Deputies also showed the lineup to two individuals at FootAction. One individual identified appellant's photograph but the other was unable to identify anyone.

At trial, Eileen Rafter could not identify anyone in the courtroom. She indicated she did not know whether she could recognize the man because he was "pretty much covered up" at the time of the robbery. Debra Jones testified she could not recognize the robber. Unlike Rafter and Jones, Phyllis Tury and Marilyn Pap identified appellant in court as the robber.

**Defense**

Appellant testified on his own behalf. He said he was 20 years old and his only prior record included approximately two traffic tickets. Appellant offered explanations for the presence of the stolen money in his residence, his connection to the stolen vehicle, his connection to the envelope used in the commission of the robberies, and the reasons for his delay in disclosing exculpatory information.

As to the stolen vehicle, appellant said a Hispanic male named "Chuy" told appellant he wanted to get rid of the car. Chuy worked in an audio store in Hanford and said the car was in bad shape. Chuy allegedly told appellant he would "like for it to just disappear." Appellant contacted an African-American male named "Spoony." Appellant described Spoony as a 25- or 26-year-old gang-banger type. Spoony told appellant he would "break bread," i.e., give appellant some money, if appellant could get him the vehicle. Appellant did not know Spoony's true name or where he lived.

Appellant contacted Chuy and said he had a "hook up that would be able to take the car." Chuy then told appellant he would make appellant a key, leave the car where appellant could pick it up, and then report the car stolen the following day. Chuy also told appellant he would get in contact with appellant regarding the details. Appellant said the plan had some hitches but was eventually realized.[3] Chuy and appellant met at a Jack-in-the-Box restaurant. Appellant and a friend followed Chuy to the latter's home on Elowin Court in a Visalia housing project. Chuy gave appellant a key to the vehicle, told him to take the car, and said

---

[3]Ten days after Chuy allegedly told appellant he would make the key, Chuy told appellant his brother-in-law had taken the car to Mexico. Appellant told Chuy to call him when everything was ready. Toward the end of January, Chuy called appellant and said his brother-in-law was back from Mexico. They decided that appellant would take the car from outside Chuy's house and that Chuy would report it stolen the next day.

he would not report the vehicle as stolen until the following day. Appellant took the car to his Hanford home, drove the car for about two weeks, and then gave the car to Spoony in March.

With respect to the stolen money, appellant said he and Spoony met again on April 8, 2000. Spoony gave appellant $500 and appellant noticed a Bank of the Sierra wrapper around the money. Although appellant suspected the money was stolen, he nevertheless went to the mall and used the money to buy pants, shirts, and some shoes from FootAction.

With regard to the envelope, appellant explained that envelopes found in his residence were from junk mail credit card offerings. Appellant suspected that someone had picked up the envelope from inside the car and used it for the robbery demand note.

Finally, appellant testified he was afraid of getting in trouble for obtaining a stolen vehicle and delayed for eight months before offering his exculpatory explanations. He claimed he had never been to Three Rivers in his life and did not commit the charged robberies.

Jesse Sindelar, a cashier at Three Rivers Market, testified he saw one Black person in Three Rivers on the day of the Bank of the Sierra robbery. Sindelar said appellant was not that person.

See Exhibit 3 at pp. 3-8, Answer.

## DISCUSSION

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

1   **II.  Legal Standard of Review**

2       This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

3   pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

4   Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

5       The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

6   Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63, 70

7   (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the

8   adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable

9   application of, clearly established Federal law, as determined by the Supreme Court of the United

10  States" or "resulted in a decision that was based on an unreasonable determination of the facts in

11  light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer,

12  538 U.S. at 70-71; see Williams, 529 U.S. at 413.

13      As a threshold matter, this Court must "first decide what constitutes 'clearly established

14  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

15  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

16  must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

17  of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly

18  established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by

19  the Supreme Court at the time the state court renders its decision." Id.

20      Finally, this Court must consider whether the state court's decision was "contrary to, or

21  involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,

22  *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the

23  writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

24  question of law or if the state court decides a case differently than [the] Court has on a set of

25  materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

26  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

27  court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

28  applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

## III.  Review of Petitioner's Claims

### A.  Ground One

In his first ground for relief, Petitioner claims his trial attorney provided ineffective assistance of counsel in violation of his Sixth Amendment right to counsel. Specifically, he asserts defense counsel failed to investigate and call Keisha Jones and Robin Ellis as alibi witnesses, and he claims defense counsel's failure to personally consult with Petitioner prior to trial was prejudicially ineffective assistance.

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so

1  serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.

2  Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an

3  objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were

4  not the result of reasonable professional judgment considering the circumstances. Id. at 688; United

5  States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's

6  performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls

7  within the wide range of reasonable professional assistance.  Strickland, 466 U.S. 668, 687, 104

8  S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

9        Second, the petitioner must demonstrate that "there is a reasonable probability that, but for

10  counsel's unprofessional errors, the result ... would have been different," 466 U.S., at 694. Petitioner

11  must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose

12  result is reliable.  Strickland, 466 U.S. at 688.  The court must evaluate whether the entire trial was

13  fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78

14  F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

15        A court need not determine whether counsel's performance was deficient before examining

16  the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S.

17  668, 697, 104 S.Ct. 2052, 2074 (1984).  Since the defendant must affirmatively prove prejudice, any

18  deficiency that does not result in prejudice must necessarily fail. However, there are certain instances

19  which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive

20  denial of the assistance of counsel or where the State has interfered with counsel's assistance. See

21  Strickland, 466 U.S. at 692; United States v. Cronic, 466 U.S., at 659, and n. 25, 104 S.Ct., at

22  2046-2047, and n. 25 (1984).  Ineffective assistance of counsel claims are analyzed under the

23  "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000).  Weighall v. Middle,

24  215 F.3d 1058, 1062 (2000).

25        The instant claim was first presented to the trial court on March 5, 2001, during a hearing on

26  Petitioner's motion for new trial. Petitioner's trial counsel, Charles Rothbaum, had been relieved as

27  counsel of record and the public defender had been appointed to represent Petitioner. A number of

28  instances of ineffectiveness were alleged including the instant claims that counsel failed to

1  investigate and call the alibi witnesses, and that counsel failed to contact Petitioner prior to trial.

2      On April 6, 2001, the trial court denied the motion. With respect to the alibi witnesses, the

3  trial court stated:

4          The court further finds the unstated but implicit contention Mr. Rothbaum did not
           adequately prepare for trial to be unfounded. Defendant claims Mr. Rothbaum abdicated his
5          trial preparation to an investigator with only several years of experience and by such
           abdication, material alibi witnesses were not interviewed and were not subpoenaed for trial.
6          The court specifically finds the evidence does not support defendant's contentions.

7  See Exhibit 3 at p. 18, Answer.

8      As to the claim that trial counsel failed to contact and confer with Petitioner prior to trial, the

9  trial court agreed that this was inconsistent with standards of professional practice. However, the

10  court found no prejudice. The court stated:

11          Mr. Brown further asserts the lack of direct, personal contact with his attorney prior to
           trial deprived him of the opportunity to receive legal advice from his counsel and to
12          otherwise adequately prepare for trial.

13          As to the deprivation of the opportunity to receive legal advice, Mr. Brown failed to
           articulate any pre-trial legal advice he would have sought to receive had Mr. Rothbaum
14          personally met with him. The assertion lack any specificity and is without a colorable claim
           of prejudice.

15
           As to the deprivation of the opportunity to meet with counsel prior to trial on trial
16          issues, this court is of the opinion it is consistent with established practice to expect that
           counsel will personally meet with a client prior to trial. This court is further of the opinion
17          Mr. Rothbaum's declination to meet with his client prior to trial establishes a prima facie
           case Mr. Rothbaum's trial preparation practice was inconsistent with a[] standard of
18          reasonable trial preparation. An attorney-client meeting is necessary to insure the attorney has
           all appropriate information to adequately prepare to defend the client.
19
           Nevertheless, this court does not find the lack of an attorney-client pre-trial meeting
20          undermines confidence in the outcome of the trial. . . . This court observed the interactions
           between Mr. Brown and Mr. Rothbaum at the trial management conference, proceedings in
21          limine and during the trial. The rapport between attorney and client was amiable and their
           communication was by all appearances continuing and productive. The court recalls a
22          number of occasions when Mr. Brown passed notes to Mr. Rothbaum during direct and
           cross-examination of witnesses. Despite appropriately aggressive cross-examination, the
23          positive identification of Mr. Brown as the perpetrator by one of the three victims was highly
           credible. The circumstantial evidence was extensive. Stolen property from the bank including
24          money and bank wrappers, were found in Mr. Brown's home. His fingerprints were in the
           perpetrator's vehicle and on the demand note.
25
   See Exhibit 3 at pp. 18-19, Answer.
26
       This claim was then presented on direct appeal to the 5th DCA.  On December 30, 2002, the
27
   5th DCA denied the claim in a reasoned opinion.  See Exhibit 3, Answer.  On February 13, 2003,
28

1    Petitioner filed a petition for review in the California Supreme Court. <u>See</u> Exhibit 4, Answer. The

2    petition was summarily denied on March 19, 2003, without comment or citation of authority. <u>Id</u>.

3    The California Supreme Court, by its "silent order" denying review of the 5th DCA's decision, is

4    presumed to have denied the claims presented for the same reasons stated in the opinion of the 5th

5    DCA.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).

6            In reviewing Petitioner's claim, the appellate court first analyzed the subject of trial counsel's

7    failure to contact Petitioner prior to trial. The appellate court found counsel had provided ineffective

8    assistance by failing to consult with Petitioner prior to trial. The court stated: "[A]dequate

9    consultation between attorney and client is an essential element of competent representation of a

10   criminal defendant." <u>See</u> Exhibit 3 at p. 21, Answer. Nevertheless, the appellate court agreed with

11   the trial court that the error was not prejudicial. The appellate court noted the evidence against

12   Petitioner was overwhelming, and absent counsel's errors, the result would not have been different.

13           With respect to the subject of counsel's failure to investigate and call the two alibi witnesses,

14   the appellate court stated, in relevant part:

15           . . . [C]ounsel has a duty to make reasonable investigations or to make a reasonable
             decision that makes particular investigations unnecessary. In any ineffectiveness case, a
16           particular decision not to investigate must be directly assessed for reasonableness in all the
             circumstances, applying a heavy measure of deference to counsel's judgments. When a
17           defendant has given counsel reason to believe that pursuing certain investigations would be
             fruitless or even harmful, counsel's failure to pursue those investigations may not later be
18           challenged as unreasonable.

19           The trial court found attorney Rothbaum prepared for trial by reviewing investigative
             reports relating to Jones and Ellis, among other things. Those statements, as summarized in
20           Daniel Garcia's May 22, 2000, investigative reports, conflicted with one another. Keisha
             Jones stated she went with Robin Ellis to appellant's house sometime between 1:00 and 2:00
21           p.m. on April 7, 2000. Robin Ellis stated she called appellant around 10:30 a.m. on April 7
             and again after she got out of her sixth period class, which she believed to be between 2:00
22           and 2:30 p.m. The trial court correctly found these statements to be inconsistent in terms of
             time and irreconcilable in terms of place and manner of contact as well as the identity of
23           those present at the time of the purported contact.

24           An attorney has no duty to call witnesses who will testify untruthfully, and in fact has
             an ethical obligation not to present perjured testimony. Here, defense counsel made a tactical
25           decision not to call Jones and Ellis as defense witnesses. Instead, attorney Rothbaum elected
             to call Jesse Sindelar, an employee of the Three Rivers market who testified he saw a Black
26           male in his store on the date of the bank robbery. Sindelar emphatically testified that
             appellant was not the man who entered the Three Rivers Market that day. He offered the
27           following description of the man he did see:

28           Um, his face was a little slimmer, and he was much darker than the fella right there

1
2
3

[the appellant]. He had braids that were sticking up about this high off his head, not corn rows, but just sticking straight up. . . . I don't know how tall he [appellant] is without standing up, but he [the man in the store] was five six and about the same build.

4

Sindelar concluded his direct examination by stating he was positive that appellant was not the man who entered the Three Rivers Market.

5
6
7
8
9
10

Even if we assume the failure to pursue an investigation of the potential alibi witnesses amounted to error, an error by counsel - even if professionally unreasonable - does not warrant the setting aside of a judgment of a criminal proceeding if the error had no effect on the judgment. In other words, the defendant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Here, appellant insists the testimony of Jones and Ellis would have produced a different result at trial. However, he ignores the fact that both potential witnesses were acquainted with him and would have been subject to implications of bias in their testimony. Moreover, their statements to investigator Garcia were initially inconsistent and those inconsistencies were eliminated only after a substantial passage of time and further inquiry by Garcia. In all likelihood, the jurors would have viewed their combined statements as nothing more than a cobbled-together alibi offered by two friends on behalf of another friend, the appellant.

11
12
13
14
15
16
17

Arrayed against this purported alibi was a tremendous amount of direct evidence inculpating the appellant. California courts have long held that fingerprint evidence is the strongest evidence of identity and is ordinarily sufficient alone to identify the defendant. The jury is entitled to draw its own inferences as to how the defendant's prints came to be on a surface and to weigh the evidence and opinion of fingerprint experts. In the instant case, law enforcement officers recovered appellant's fingerprints from the envelope used for the demand note and from the burned green Honda Accord. Deputies found a matching envelope in appellant's residence as well as a roll of money in a Bank of the Sierra wrapper. Deputies also found receipts showing that at 7:01 p.m. on the day of the bank robbery, appellant tendered $300 to purchase $283.68 worth of shoes and clothes from FootAction USA in the Hanford Mall. Teller Phyllis Tury identified appellant's picture in the photographic lineup. Customer Marilyn Pap was not sure but said if she were to select a photograph it would be that of appellant. Both Tury and Pap identified appellant in the courtroom as the bank robber.

18
19
20

Given all of the foregoing facts and circumstances, we cannot say appellant has demonstrated a reasonable probability the result of the proceeding would have been different absent counsel's various acts and omissions.

21

See Exhibit 3 at pp. 22-24, Answer (citations omitted).

22
23
24
25
26
27
28

This Court agrees with the determination reached by the state courts. The trial court and the appellate court correctly identified and applied governing Supreme Court precedent in Strickland v. Washington, 466 U.S. 668, (1984). Both state courts concluded trial counsel rendered ineffective assistance by failing to consult with Petitioner prior to trial. This conclusion is correct, as "adequate consultation between attorney and client is an essential element of a competent representation of a criminal defendant." Correll v. Ryan, 465 F.3d 1006, 1010 (9th Cir. 2006), citing United States v. Tucker, 716 F.2d 576, 581 (9th Cir. 1983). Both courts further found that trial counsel's decision not

to contact and subpoena Ellis and Jones was an informed and tactical decision. This conclusion is reasonable. The record showed trial counsel was aware of the alibi witnesses via investigator reports which he reviewed. Trial counsel stated he determined the alibi witnesses would only hurt Petitioner because their accounts differed in time and location, and they could easily be impeached based on bias.  The state court determination is not an unreasonable application of <u>Strickland</u>, since the court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  <u>Strickland</u>, 466 U.S. at 687.

In any case, the Court agrees with the state courts that Petitioner did not suffer prejudice as a result of the errors committed by trial counsel. The evidence of Petitioner's guilt was substantial and overwhelming. Petitioner was positively identified by two of the victims. His fingerprints were found on the demand note and the burned vehicle. A matching bank envelope was found in Petitioner's bedroom, and a bundle of one dollar bills wrapped in a Bank of the Sierra wrapper was found in a drawer in Petitioner's bedroom. A bank employee identified her initials on the money found in Petitioner's bedroom. Also, deputies found receipts from FootAction USA that showed Petitioner had tendered $300 to purchase $283.68 worth of merchandise on the evening the date of the robbery. Given the above, there is no reasonable probability that, but for counsel's unprofessional errors, the result would have been different. <u>Strickland</u>, 466 U.S. at 694. The claim should be denied.

**B.  Ground Two**

Petitioner next claims the public defender rendered ineffective assistance of counsel by failing to obtain sworn declarations from alibi witnesses Jones and Ellis to offer as proof in the motion for new trial.  The public defender attached copies of the investigative reports which were ruled inadmissible hearsay. Had the public defender submitted sworn declarations in admissible form, Petitioner contends the motion for new trial would have been granted because these witnesses would have provided him with an alibi.

As more fully discussed above, when considering a claim of ineffective assistance of counsel, a habeas court must consider two factors: 1) whether Petitioner has shown counsel's performance to be deficient; and 2) whether Petitioner has demonstrated that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different." <u>Strickland</u>, 466 U.S.

1    at 687, 694.

2         On April 6, 2001, the trial court considered the public defender's arguments and denied the

3    motion for new trial. The trial court ruled as follows:

4         On May 17, 2000, Ms. Jones provided a statement to an investigator for Mr. Brown.
     Ms. Jones stated she is a friend of Mr. Brown and she lived across the street from him on the
5    day of the incident. She said she remembered the day in question because defendant paid her
     $20 for help with his taxes and because she picked up some items from lay away on the same
6    day. She reported she went over to defendant's house sometime between one and two in the
     afternoon and Mr. Brown was washing his car. She stated Robin Ellis went with her to visit
7    with Mr. Brown. The travel time between Hanford and Three Rivers where the crime
     occurred is about an hour. The robbery occurred at 3:00 p.m. and the robber was identified as
8    being in the Three Rivers area prior to the robbery.

9         On May 22, 2000, the same investigator obtained a statement from Ms. Ellis. She
     reported to the same investigator she is a friend of Mr. Brown's who lived across the street
10   from him. Her stated address was the same as that of Ms. Jones. She said [she] remembered
     the events of the date in question because it was her birthday. She said she was at school that
11   afternoon and she called Mr. Brown from school at his home between 2:00 p.m. and
     2:30 p.m. She stated Mr. Brown was washing his car at the time of her call.
12
          Standing alone, Ms. [Jones] was a viable alibi witness. Standing alone, Ms. Ellis was
13   a viable alibi witness. Together, their statements are inconsistent in terms of time. Of much
     greater significance is their fatal irreconcilability in terms of place of contact, the manner of
14   contact and those present at the time of their purported contact. Mr. Rothbaum's testimony he
     prepared for trial and in doing so reviewed the investigative reports relating to Jones and Ellis
15   is credible. Given the irreconcilable nature of the statements of Ms. Ellis and Ms[.] Jones, for
     counsel to direct further interviews in an effort to mesh their statements or to simply
16   subpoena only one of them would have been tantamount to suborning perjury. Mr.
     Rothbaum's decision to ignore any implicit or direct suggestion to take further action on [the]
17   car washing alibi was appropriate and consistent with his professional obligations and the
     law.
18
     See Exhibit 3 at pp. 28-29, Answer.
19
          This claim was presented to the 5th DCA on appeal and denied on in a reasoned decision. See
20
     Exhibit 3, Answer.  Petitioner then raised the claim to the California Supreme Court in a petition for
21
     review; it was also denied. See Exhibit 4, Answer. The California Supreme Court, by its "silent
22
     order" denying review of the 5th DCA's decision, is presumed to have denied the claim presented for
23
     the same reasons stated in the opinion of the 5th DCA.  Ylst v. Nunnemaker, 501 U.S. 797, 803
24
     (1991).
25
          In its review of this claim, the 5th DCA found no prejudice resulting from the public
26
     defender's alleged error. The 5th DCA stated:
27
          In the instant case, appellant supported his new trial motion with his own sworn
28        declaration as well as the March 2001, declarations from the public defender and the two

1   potential alibi witnesses. However, he only provided investigative reports of Daniel Garcia to
2   expose and clarify inconsistencies in the stories of the alibi witnesses and thereby solidify
    their defense for purposes of the new trial motion. Appellant maintains Jones's and Ellis's
3   subsequent statements harmonized their earlier statements. He argues if the public defender
    had successfully introduced Jones's and Ellis's subsequent statements, then the trial court
4   "could not possibly have found that Rothbaum had been justified in failing to re-contact these
    witnesses."

5       As the People properly point out, the underlying concern of the new trial motion was
    to determine whether attorney Rothbaum's assistance was ineffective and not to relitigate the
6   issue of appellant's guilt or innocence. Sworn declarations would have had minimal impact
    on the issue of Rothbaum's ineffectiveness because trial counsel's conduct must be evaluated
7   "on the facts of the particular case, viewed as of the time of counsel's conduct." In any event,
    on a motion for new trial, the trial court considers the proper weight to be accorded to the
8   evidence and decides whether or not, in its opinion, there is sufficient credible evidence to
    support the verdict. Here, the fingerprint evidence combined with photo lineup identifications
9   constituted strong evidence in support of appellant's convictions. As the People point out, "A
    post-trial effort, by two biased individuals, to remove any and all inconsistencies and
10  contradictions in their statements [was] suspicious at best."

11      In our view, it is not reasonably probable that - - but for the public defender's failure
    to supply affidavits or declarations of the alibi witnesses - - the result would have been
12  favorable to appellant. Reversal for ineffective assistance is not required.

13  See Exhibit 3 at pp. 31-32, Answer.

14      The state court resolution of Petitioner's claim was not unreasonable. As pointed out by

15  Respondent, any affidavits that the public defender could have secured from the alibi witnesses and

16  submitted to the trial court during the hearing would have had little impact, if any, on the trial court's

17  determination whether Petitioner received ineffective assistance from trial counsel. The statements

18  were biased, and the evidence of Petitioner's guilt was overwhelming. Therefore, even assuming the

19  public defender erred in failing to submit affidavits from the alibi witnesses, Petitioner has failed to

20  demonstrate any prejudice resulting therefrom. The claim should be rejected.

21  **C.  Ground Three**

22      Petitioner notes the appellate court held Petitioner's Fifth Amendment privilege against self-

23  incrimination was violated when the prosecutor elicited testimony concerning his post-arrest silence.

24  Petitioner alleges the appellate court erred in holding the error was harmless under the Chapman[4]

25  standard.

26      On direct examination during the defense case, Petitioner testified that no one from the

27

28  _____

    [4] Chapman v. California, 386 U.S. 18, 24 (1967).

1  government had obtained a handwriting sample from him to compare with the robbery note. <u>See</u>

2  Exhibit 3 at p. 32, Answer. On cross-examination, the following colloquy took place:

3  Q. [by Deputy District Attorney Harris] Mr. Brown, no one asked you for a handwriting sample; correct?

4

5  A. Correct.

Q. But they did ask to talk to you; correct?

6  A. Yes, the officers.

7  Q. *And you refused to speak to them; correct?*

8  A. *Yes.*

9  MR. ROTHBAUM [Defense counsel]: Your Honor, may we approach?

10  THE COURT: Yes, you may. [¶] Ladies and gentlemen, take a ten-minute recess, please.

11  (Whereupon, the following proceedings were held in chambers, to wit:)

12  MR. ROTHBAUM: I think we just witnessed reversal of error.

13  MS. HARRIS: And Mr. Rothbaum opened the door by asking if any government employees

14  asked to get samples from him. If he refused to speak to them about those samples, then - -

15  THE COURT: Why couldn't you come to court and get an order from the court for him to provide handwriting exemplars?

16  MS. HARRIS: We could, but that's improper to influence the jury to say that we had some

17  right to get information from him if he wasn't willing to give it to us. [¶] . . . [¶]

18  THE COURT: Excuse me. There - - are you making a motion for mistrial?

19  MR. ROTHBAUM: Yes, I am, on the basis of <u>Griffin</u> error. I think it's <u>Griffin</u> error, commenting on his right to remain silent.

20  MS. HARRIS: Le me just stop here by saying I think that the whole entire line of Mr.

21  Rothbaum's questioning opened the door for this by him asking him about how he kept the story to himself the entire time, and this is the first time he's brought this story to our

22  attention.

23  I mean, sure, he has a right not to speak to officers because he has a 5th Amendment privilege,

24  but he's testified to all of this already; that he kept the story to himself; that he didn't tell anyone.

25  He's bringing it up for the first time and that no one approached him to ask him for any

26  information that would help us prove up our crime when the truth is he's testified to all of this already on direct examination.

27  THE COURT: Excuse me. On its face, I believe that there is <u>Griffin</u> error; however, this happens so rarely that a testifying defendant would be asked why he invoked his right to

28  remain silent that I want to see some authority from you that that is not reversible - - that that

1    is not misconduct such as to compel a mistrial.

2    See Exhibit 3 at pp. 32-33, Answer (emphasis added).

3        The trial court ruled on Petitioner's motion for mistrial, outside of the presence of the jury, as

4    follows:

5            [T]his is my tentative ruling on defense's motion for mistrial: State of the evidence is
         that the prosecutor posed a question that clearly touched upon Mr. Brown's right to remain
6        silent, which is clearly improper, and prior to the case of Greer versus Miller, 1987 at 483
         U.S. 756, specifically page 763, it appears to me it would have been proper to grant the
7        motion for mistrial; however, the Greer analysis is that a Doyle violation has two
         components, both of which must exist.
8
             The first element is the prosecution makes use of a defendant's post-arrest silence for
9        impeachment purposes. The prosecutor clearly did that by asking the . . . question. . . .

10           The second essential element is that the trial court permits that use. The trial court in
         this case is not going to permit that use. I am going to sustain the objection and remind the
11       jury that questions are not evidence, and they're not to consider questions in any way in their
         deliberations. That's my tentative ruling on the issue.
12
     See Exhibit 3 at pp. 33-34, Answer.
13
         The trial court subsequently admonished the jury:
14
             Ladies and gentlemen, remember, questions asked by an attorney are not evidence. If
15       there's no answer, the question is meaningless. It has no - - thank you. I'll start over again.

16           The - - objection is sustained. Ladies and gentlemen, remember, questions are not
         evidence. I'll tell you later that essentially, the only significance of a question is the meaning
17       that it might give to an answer. It's the answer that's the evidence, never the question. [¶]
         Whenever a question - - whenever the court sustains an objection to a question, the question
18       is to be entirely disregarded and not considered in any way.

19   See Exhibit 3 at p. 34, Answer.

20       It is well-settled that a violation of an arrested person's Fifth Amendment privilege against

21   self-incrimination occurs when that person's silence is allowed to be used to impeach an explanation

22   subsequently offered at trial. Doyle v. Ohio, 426 U.S. 610, 618 (1976).  The holding in Doyle rests

23   on "the fundamental unfairness of implicitly assuring a suspect that his silence will not be used

24   against him and then using his silence to impeach an explanation subsequently offered at trial."

25   South Dakota v. Neville, 459 U.S. 553, 565 (1983). There are two elements to a Doyle violation: 1)

26   Use of a defendant's post-arrest silence for impeachment; and 2) The impeachment was permitted by

27   the trial court. Greer v. Miller, 483 U.S. 756, 763-764 (1987) (A Doyle violation does not occur

28   where the inquiry that Doyle forbids is not permitted by the trial court.).

1    As with the two previous claims, this claim was presented to the 5th DCA on appeal and

2  denied in a reasoned decision. See Exhibit 3, Answer.  The claim was then raised to the California

3  Supreme Court in a petition for review, and denied. See Exhibit 4, Answer. By its "silent order"

4  denying review, the California Supreme Court is presumed to have denied the claim presented for

5  the same reasons stated in the opinion of the 5th DCA.  Ylst v. Nunnemaker, 501 U.S. 797, 803

6  (1991).

7    The appellate court reviewed the claim and found the Doyle error to be harmless beyond a

8  reasonable doubt under Chapman v. California, as follows:

9        Whether Doyle error has occurred must be considered in light of Greer v. Miller
10   (1987) 483 U.S. 756, 763. In Greer, the defendant presented exculpatory testimony and the
     prosecution asked, "Why didn't you tell this story to anybody when you got arrested?"
     Defense counsel immediately objected and, out of the jury's hearing, requested a mistrial
11   based on Doyle error. The trial judge denied the motion but immediately sustained the
     objection and instructed the jury to ignore the question for the time being. The prosecutor did
12   not pursue the issue further or mention it during his closing argument. At the conclusion of
     all the evidence, defendant's counsel did not renew his objection or request an instruction
13   concerning the prosecutor's question. Moreover, the judge specifically instructed the jury to
     disregard questions to which objections were sustained. The jury found defendant guilty but
14   his conviction was set aside because of Doyle error. The United States Supreme Court
     reversed, finding no Doyle error.

15
         In reaching its conclusion, the Supreme Court explained a Doyle error has two
16   components. First, the prosecution must make use of a defendant's postarrest silence for
     impeachment purposes. This can occur either by questioning or reference in closing
17   argument. Second, the trial court must permit that use. The type of permission will usually
     take the form of overruling a defense objection, thus conveying to the jury the unmistakable
18   impression that what the prosecution is doing is legitimate. Greer involved the situation in
     which the prosecutor attempted to violate the rule of Doyle by asking an improper question in
19   the presence of the jury. In each case in which the United States Supreme Court has applied
     Doyle, the trial court has permitted specific inquiry or argument respecting the defendant's
20   post-Miranda silence. Neither "inquiry" nor "argument" requires an evidentiary platform and
     both can make do with inference or innuendo. California and federal courts have long
21   accepted that Doyle can be violated by a mere reference or virtually any description of a
     defendant's silence following arrest and a Miranda warning.

22
         The prosecutor in the instant case clearly met the foregoing criteria. Moreover, as
23   appellant points out, the prosecutor's conduct exceeded that of the prosecutor in Greer
     because her question to the appellant was in fact answered in the jury's presence. The next
24   question is whether the error can be treated as harmless beyond a reasonable doubt, i.e.,
     whether it is clear beyond a reasonable doubt that use of the statement did not contribute to
25   the verdict. (U.S. v. Kallin (9th Cir. 1995) 50 F.3d 689, 693; U.S. v. Newman (9th Cir. 1991)
     943 F.2d 1155, 1157-1158.) Under this test, the appropriate inquiry is not whether, in a trial
26   that occurred without the error, a guilty verdict actually rendered in this trial was surely
     unattributable to the error.

27
         The People initially acknowledge "the question should not have been asked."
28   Nevertheless, they submit the question was harmless beyond a reasonable doubt under the

attendant circumstances. A review of the record supports their conclusion for a number of reasons. First, appellant candidly testified he did not tell anyone of his alibi for eight months. The prosecutor was able to question appellant and comment upon the eight-month failure to disclose his alibi to anyone, including his own counsel. Second, defense counsel interposed an objection immediately after the prosecutor asked the offending question about appellant's postarrest silence. Third, the court sustained the objection and instructed the jury to disregard the question. Fourth, the court subsequently instructed the jurors in CALJIC No. 1.02 (statements of counsel – evidence stricken out – insinuations of questions – stipulated facts) as follows:

> Statements made by the attorneys during the trial are not evidence. However, if the attorneys have stipulated or agreed to a fact, you must regard that fact as proven. If an objection was sustained to a question, do not guess what the answer might have been. Do not speculate as to the reason for an objection. Do not assume to be true any insinuation suggested by a question asked a witness. A question is not evidence and may be considered only as it helps you to understand the answer.

> Do not consider for any purpose any offer of evidence that was rejected or any evidence that was stricken by the court. Treat is as though you had never heard of it.

Fifth, strong evidence supported appellant's robbery conviction and his alibi was not credible. Law enforcement officers recovered appellant's fingerprints from the envelope used for the demand note and the stolen vehicle used in the commission of the robbery. Fingerprint evidence is the strongest evidence of identity and is ordinarily sufficient alone to identify the defendant. The jury is entitled to draw its own inferences as to how the defendant's prints came to be on a surface and to weigh the evidence and opinion of fingerprint experts. In addition to the fingerprint evidence, deputies found a roll of money bearing a Bank of the Sierra band inside appellant's bedroom. Phyllis Tury identified appellant's photograph in a six-picture lineup and testified she was 100 percent positive of the identification. Eileen Rafter and Marilyn Pap thought appellant's photograph depicted the robber but they were not completely certain. At trial, both Tury and Pap identified appellant in the courtroom as the robber. An employee of the FootAction store also identified appellant's photograph.

Finally, Eileen Rafter testified the robbery of the Bank of the Sierra occurred around 2:45 p.m. on April 7, 2000. On April 17, 2000, Detective Chambers and other officers searched appellant's Hanford residence and found two receipts from the FootAction store in a pocket of appellant's jeans. The trial court admitted these receipts into evidence upon stipulation of the parties. During closing argument, the prosecutor observed the receipts documented "transactions that took place less than four hours after the bank robbery."[5] Despite this documentary evidence, appellant claimed Spoony gave him the money on Saturday, April 8, and that appellant made the purchases at the mall on that same day.

In *Chapman v. California, supra*, 386 U.S. at p. 24, the United States Supreme Court set forth the test for determining whether a constitutional error is harmless. That test is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. More recently, the Supreme Court phrased the harmless error doctrine in the form of a question: Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error? The doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence. Further, the doctrine promotes public respect for the criminal process by focusing

---

[5]A review of the exhibit reveals only one of the two receipts bears the robbery date of April 7, 2000.

1    on the underlying fairness of the trial.

2          Given the evidence set forth above, it is clear beyond a reasonable doubt a rational
     jury would have found appellant guilty absent the prosecutor's solitary question about
3    appellant's postarrest silence. Therefore, reversal is not required.

4    See Exhibit 3 at pp. 37-40, Answer (some citations omitted).

5          The appellate court's application of the Chapman harmless error standard was not

6    unreasonable. As in Greer, the trial court in this case did not permit the inquiry that Doyle forbids.

7    While it is true Petitioner answered the question posed by the prosecutor, the court explicitly

8    sustained defense counsel's objection to the question. No further questioning or argument with

9    respect to Petitioner's silence occurred, and the court specifically advised the jury that it should

10   disregard any questions to which an objection was sustained.  The prosecutor was not "allowed to

11   undertake impeachment on," or "permit[ted] ... to call attention to," Petitioner's silence. Doyle, 426

12   U.S. at 619, and n. 10. The fact of Petitioner's post-arrest silence was not submitted to the jury as

13   evidence from which it was allowed to draw any permissible inference. In addition, as previously

14   discussed the evidence of Petitioner's guilt was overwhelming. Thus, Petitioner's claim should be

15   rejected.

16         **D.  Ground Four**

17         In his fourth claim for relief, Petitioner contends the trial court erred in instructing the jury

18   with CALJIC No. 2.15. Petitioner argues the instruction lessened the prosecution's burden of proof.

19         CALJIC No. 2.15, as read to the jury, provided:

20         If you find that a defendant was in conscious possession of recently stolen property, the fact
           of that possession is not by itself sufficient to permit an inference that the defendant is guilty
21         of the crime of robbery. Before guilt may be inferred, there must be corroborating evidence
           tending to prove defendant's guilt. However, this corroborating evidence need only be slight
22         and need not by itself be sufficient to warrant an inference of guilt.

23         As corroboration you may consider the attributes of possession, such as time, place and
           manner, and any other evidence which tends to connect the defendant with the crime charged.
24
     See Exhibit 3 at p. 41, Answer.
25
           The 5th DCA, quoting the Sixth District Court of Appeals in People v. Williams, 79
26
     Cal.App.4th 1157, 1173-74 (2000), rejected this claim, stating:
27
           CALJIC No. 2.15 correctly prohibits the jury from drawing an inference of guilt solely from
28         conscious possession of recently stolen property but properly permits the jury to draw such an

inference where there is additional corroborating evidence. As long as the corroborating evidence together with the conscious possession could naturally and reasonably support an inference of guilt, and that inference is sufficient to sustain a verdict beyond a reasonable doubt, we discern nothing that lessens the prosecution's burden of proof or implicates a defendant's right to due process. Indeed, CALJIC No. 2.15 has repeatedly withstood challenges on the grounds that it lessens the burden of proof or otherwise denies a defendant due process of law.

See Exhibit 3 at p. 43, Answer.

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Estelle v. McGuire, 502 U.S. 62, 72 (1991). Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. See United States v. Frady, 456 U.S. 152, 169 (1982), citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977). Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.); see also Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996). A jury instruction is constitutionally sound if it creates a permissive inference that allows, but does not require, the jury to infer an essential fact from proof of another fact so long as "the inferred fact is more likely than not to flow from the proved fact on which it is made to depend." Schwendeman v. Wallenstein, 971 F.2d 313, 316 (9th Cir.1992) (citations and internal quotations omitted), cert. denied, 113 S.Ct. 975 (1993).

CALJIC No. 2.15 does not require the jury to infer any fact; therefore, it is permissive. See Schwendeman, 971 F.2d at 316. In this case, the jury was also instructed that: (1) guilt must be established beyond a reasonable doubt; (2) the burden of proof is on the prosecution; and (3) if there are two reasonable interpretations of the evidence, the jury must adopt the interpretation pointing to innocence. (CT 128-129 (CALJIC No. 2.01); CT 139-140 (CALJIC Nos. 2.90 and 2.91).) Reading CALJIC No. 2.15 together with the other instructions, the instruction did not shift the burden of proof to Petitioner or allow the jury to infer an improper fact. See Schwendeman, 971 F.2d at 316.

1  Moreover, as previously discussed the evidence of Petitioner's guilt was overwhelming. Therefore,

2  there is no reasonable likelihood that the jury applied CALJIC No. 2.15 in an unconstitutional

3  manner. The claim should be denied.

4  **E.  Ground Five**

5       In his next ground for relief, Petitioner claims the instruction, CALJIC 17.41.1, violated the

6  defendant's right to an independent and impartial jury in violation of the Sixth and Fourteenth

7  Amendments by interfering with jury deliberations.

8       CALJIC 17.41.1, as given by the trial court, provides:

9            The integrity of a trial requires that jurors, at all times during their deliberations,
        conduct themselves as required by these instructions, and in accord with their duties. ¶
10       Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to
        disregard the law or to decide the case based on penalty or punishment, or any other improper
11       basis, it is the obligation of the other jurors to immediately advise the Court of the situation.

12  See Exhibit 3 at pp. 43-44, Answer.

13      As previously stated, to obtain federal collateral relief for errors in the jury charge, a

14  petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting

15  conviction violates due process. Estelle v. McGuire, 502 U.S. 62, 72 (1991). Even if it is determined

16  that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if

17  the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in

18  actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

19      In rejecting this claim, the 5th DCA stated:

20           The directive set forth in CALJIC No. 17.41.1 is a vehicle for ensuring that jurors
        comply with their duties. CALJIC No. 17.41.1 does nothing more than remind jurors of their
21       obligation to follow the instructions given to them, which is absolutely proper. CALJIC No.
        17.41.1 is consistent with the long-established law that the trial court has the right to instruct
22       the jury on the law, and the jury has the duty to obey its instructions. CALJIC No. 17.41.1
        neither interferes with a defendant's right to a jury trial nor has a chilling or coercive effect
23       on juror deliberations. Each juror takes an oath to try the pending cause and render a true
        verdict "according only to the evidence presented to you and to the instructions of the court."
24       ([Cal.] Code Civ. Proc., § 232, subd. (b).)

25           In People v. Cleveland (2001) 25 Cal.4th 466, 475-476, a companion case to
        Williams, the Supreme Court acknowledged that caution must be exercised in determining
26       whether a juror has refused to deliberate. However, the need to protect the sanctity of jury
        deliberations does not preclude reasonable inquiry by the court into allegations of misconduct
27       during deliberations. CALJIC No. 17.41.1 enables the trial court to conduct a reasonable
        inquiry when a possibility of misconduct exists. The instruction does nothing more than
28       remind the jurors of their oath and obligation, then enlist them in aiding the detection of oath

1     violators.

2          In *People v. Engelman* (2002) 28 Cal.4th 436, the California Supreme Court even
more recently held CALJIC No. 17.41.1 does not infringe upon a defendant's federal or state
3     constitutional right to trial by jury, or his state constitutional right to a unanimous jury
verdict. While the court concluded the instruction should not be given in future trials, it
4     rejected defendant's claim that his conviction should be reversed because the instruction was
given to the jury in his case. In accordance with *Engelman*, we therefore reject appellant's
5     constitutional claims and conclude his convictions need not be reversed simply because the
instruction was given in this case. As was true in *Engelman*, there is no allegation the jury
6     had difficulties with respect to deliberations in the present case, so the prospective ban on the
instruction has no impact here.
7
See Exhibit 3 at pp. 45-46, Answer (citations omitted).
8
9          In this case, there is nothing in the record which supports Petitioner's allegation. There was

10    no report of a juror refusing to deliberate or disregarding the law. There was no jury deadlock and no

11    holdout juror. In short, there is no reason to believe the court's use of CALJIC 17.41.1 played any

12    role in the jury's deliberations. There is no evidence that deliberations were improperly chilled, that

13    majority jurors improperly imposed their will on the minority, or that Petitioner was denied his right

14    to a unanimous jury and fair trial. Therefore, Petitioner has failed to demonstrate any prejudice

15    resulting from this instruction.

16         Moreover, Petitioner has failed to establish a federal constitutional violation.  The Supreme

17    Court has not held this instruction to be unconstitutional, and Petitioner does not point to any

18    Supreme Court authority which would bar the giving of this instruction.  The claim is foreclosed by

19    Brewer v. Hall, 378 F.3d 952, 957 (9th Cir.2004), which affirmed a district court's denial of the same

20    claim because there is no clearly established federal law holding that CALJIC 17.41.1 violates an

21    existing constitutional right.

22         Accordingly, the rejection of this claim by the state courts was neither contrary to or an

23    unreasonable application of clearly established Federal law, nor an unreasonable determination of the

24    facts in light of the evidence presented. See 28 U.S.C. § 2254(d). The claim should be denied.

25    **F.  Ground Six**

26         In his sixth and final ground for relief, Petitioner contends the cumulative effect of the errors

27    he has asserted deprived him of his constitutional right to due process and a fair trial.

28         A defendant may prove that he has suffered prejudice based on the cumulative effect of

1   errors. <u>Kyles v. Whitley</u>, 514 U.S. 419, 421-22, 440-41 (1995) (in determining whether exculpatory

2   evidence suppressed by state is sufficiently material to violate Due Process Clause, court is required

3   to assess "cumulative" or "net" effect of all suppressed evidence and commits legal error if it only

4   conducts piecemeal analysis of each item of suppressed evidence); <u>O'Neal v. McAninch</u>, 513 U.S.

5   432, 435-36 (1995) (accepting lower court's assumption that "confusion arising out of a trial court

6   instruction about the state of mind necessary for conviction combined with a related statement by a

7   prosecutor" required habeas corpus relief if "combined" error was not harmless); <u>Fuller v. Roe</u>, 182

8   F.3d 699, 704 (9th Cir.1999) ("cumulative effect of several errors may prejudice a defendant to the

9   extent that his conviction must be overturned"); <u>Cooper v. Fitzharris</u>, 586 F.2d 1325, 1333 (9th

10  Cir.1978) (concluding cumulative effect of alleged errors may demonstrate prejudice), *cert. denied*,

11  440 U.S. 974 (1979).

12       In this case, however, none of the claims raised by Petitioner have merit.  Accordingly,

13  Petitioner cannot demonstrate prejudice resulting from the cumulative effect of the errors, because

14  there are no errors affecting the verdict to accumulate. <u>See</u> <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 632,

15  (9th Cir.1997) (*per curiam*). The claim should be rejected.

16                              **RECOMMENDATION**

17       Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

18  DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

19  Respondent.

20       This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United

21  States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304

22  of the Local Rules of Practice for the United States District Court, Eastern District of California.

23  Within thirty (30) days (plus three days if served by mail) after being served with a copy, any party

24  may file written objections with the court and serve a copy on all parties.  Such a document should

25  be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the

26  objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail)

27  after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to

28  28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified

1    time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th

2    Cir. 1991).

3

4          IT IS SO ORDERED.

5          Dated:    **March 13, 2007**                    _____/s/ **Dennis L. Beck**_____
     23ehd0                                          UNITED STATES MAGISTRATE JUDGE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28